# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 4, 2002 Session

## STATE OF TENNESSEE v. ROBERT FROST

### Direct Appeal from the Circuit Court for Tipton County
### No. 3979      Joseph H. Walker, Judge

---

### No. W2001-00818-CCA-R3-CD - Filed May 16, 2003

---

A Tipton County jury convicted the defendant, Robert Frost, of bribery of a public servant. The trial court subsequently ordered the defendant to serve three years as a standard offender in community based alternative sentencing. The defendant now brings this direct appeal of his conviction, challenging (1) the trial court's decision to admit certain exhibits over his objection; (2) a certain portion of the trial court's instruction to the jury regarding his indicted offense; and (3) the sufficiency of the evidence to support his conviction. After a thorough review of the record, we find that none of the defendant's allegations merit relief and accordingly affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JAMES CURWOOD WITT, JR., JJ., joined.

C. Michael Robbins, Memphis, Tennessee, on appeal; and J. Thomas Caldwell, Ripley, Tennessee, at trial, for appellant, Robert Frost.

Paul G. Summers, Attorney General & Reporter; John H. Bledsoe, Assistant Attorney General; Elizabeth Rice, District Attorney General; and James Walt Freeland, Assistant District Attorney General, for appellee, State of Tennessee.

# OPINION

## Factual Background

On April 29, 2000, Investigator Rickey Chandler of the Covington Police Department, Roy Grant, Chandler's informant on occasion, and the defendant, Constable Robert Frost,[1] were discussing a possible sting operation based on some information about the location of illegal narcotics at a local motel. The information about the location of these narcotics was provided to Chandler and the defendant by Grant. Chandler ultimately concluded that he did not want to proceed with the sting operation because of Grant's intoxicated state, which cast doubt on the reliability of his information and therefore Chandler's ability to obtain a warrant based on that information. The next day, April 30, 2000, the three attempted to carry out the sting operation once again. However, at the last minute, Grant decided not to go through with the plan.

In the early morning hours of April 30, 2000, the defendant and Grant apparently devised a plan to confiscate some illegal drugs that Grant reported were in the home of Vivian Mitchell. Grant, who was a friend of Mitchell's, subsequently entered her house. At that time, Michael Hoover and his girlfriend were visiting Mitchell's house. Grant told Hoover that he was running from the defendant, and the two of them then shared a marijuana joint while Grant supposedly hid from the defendant in Mitchell's house. Ten to thirty minutes after Grant's arrival, the defendant entered Mitchell's house with his weapon drawn and ordered Grant and Hoover to stand against the wall. The defendant told Grant and Hoover that he had heard that there were drugs in Mitchell's house. The defendant then searched the house and supposedly discovered a matchbox containing crack cocaine rocks, as well as Hoover's marijuana, which was on a table in plain view. After Hoover claimed ownership of the marijuana, the defendant handcuffed Hoover and took him outside. At this time, the defendant told Hoover that if Hoover were to pay him $100 in addition to the $100 that the defendant removed from Hoover's person when frisking him, the defendant would allow Hoover to go free and not report the arrest. The defendant gave Hoover a week to pay him this sum of money, which was the time period that Hoover reported he would need to get the $100.

Several days after the arrest, Hoover recognized that he would not be able to get the $100 that he promised to pay the defendant. Fearing that the defendant would make good on his threat to plant the confiscated marijuana on Hoover and re-arrest him, Hoover decided to contact the police. Hoover's friend, Anna Rivera, drove him to Investigator Chandler's house where Hoover briefly met with Chandler and reported the incident. Chandler, not wanting to discuss this matter at his home, agreed to meet Hoover at the police station after Chandler's dinner hour. When Hoover met with Chandler at the police station, Hoover recounted the events of April 30, 2000 as stated above. Chandler then warned Hoover that Hoover was making very serious allegations against the defendant and that his allegations ought to be truthful. Chandler subsequently contacted the Tennessee Bureau of Investigation (TBI), who routinely handles investigations of corruption of public officials. Thereafter, Agent Turner of the TBI assisted Chandler in the investigation of these allegations.

---

[1] The defendant had been elected to the position of constable approximately two years prior to his trial. According to the record, a constable is an elected law enforcement position whose primary duties involve the service of warrants. See Tenn. Code Ann. § 8-10-108.

On May 4, 2000, Hoover met with Turner, Chandler, and Covington Police Captain Bennie Carver to discuss an arranged meeting between Hoover and the defendant. Hoover was then wired with a kell set for monitoring this meeting. Hoover contacted the defendant from a payphone and arranged to meet the defendant at the defendant's automobile repair shop. The police officers then hid their vehicles and prepared to monitor the meeting through the kell set that Hoover was wearing.

Hoover subsequently entered the defendant's automobile repair shop and waited approximately a half hour to forty-five minutes before the defendant arrived. Once the defendant arrived, Hoover gave the defendant $100 consisting of five marked twenty dollar bills, and the defendant accepted the money, responding that he was surprised that Hoover was able to pay him. Hoover responded that he paid the money in order to avoid getting in trouble. The defendant then placed the money in his front pocket and assured Hoover that the evidence was taken care of and not to worry about the charges. After the conversation ended, Hoover left the defendant's shop as he was instructed to do. Immediately thereafter, Turner, Carver and Chandler entered the defendant's shop and placed him under arrest.

Once the defendant had been transported to the police station, he signed a waiver of his rights and agreed to give a statement to the police. In his statement, the defendant alleged that in the early morning hours of April 30, 2000, he decided to investigate Vivian Mitchell's house based on Grant's tip. After the defendant arrived at the house, Grant opened the door, and the defendant saw some illegal drugs lying on a pair of pants that were on the floor. After Hoover claimed ownership of the drugs, the defendant proceeded to arrest him. Grant then asked the defendant to "forget" the charges for $100, claiming that he would get the defendant the money by the following Wednesday or Thursday. The following Thursday, Hoover arrived at the defendant's shop with $100. The defendant accepted the money and agreed to forget about the incident. The defendant also claimed that he disposed of Hoover's drugs in a dumpster by a local pawn shop and that he had never done anything like this before, did not know why he did it, and did not feel that he had done anything wrong. The prosecution introduced this statement as evidence against the defendant at trial.

At trial, the defendant elected to testify on his own behalf, as well. During his testimony, the defendant alleged that his arrest had been orchestrated by Chandler who, in turn, had been instructed by Carver and the mayor to "get" the defendant because Carver and the mayor wanted the defendant to testify for the state in a case against Junior Baskin, the defendant's long-time friend. The defendant claimed that the Mitchell house bust had been Chandler's idea and that Grant was acting as Chandler's informant on that evening. The defendant claimed that he wore a kell set when entering the Mitchell home and that he fully expected Chandler to arrive at any minute to back him up. He also claimed that he did not discover that Hoover had any marijuana, but that he did discover a substance in a match box that he initially thought was crack cocaine but, after examining it, determined that it was merely baking powder. Accordingly, he never arrested Hoover. The defendant further testified that Hoover arrived at his store on the day of his arrest in order to pay the defendant for some repair work performed on Hoover's car. The defendant further testified that after his arrest, Chandler forced him to sign a blank statement form, which Chandler later filled in with a fabricated statement.

Anna Rivera, the person who drove Hoover to Chandler's house for their initial meeting, testified for the defendant, as well. Rivera testified that on the day that Hoover first contacted Chandler, Hoover initially instructed her to drive to the defendant's shop so that he could pay the

defendant for some automobile repair work. En route, Hoover changed his mind and instructed Rivera to drive him to Chandler's house, instead. Rivera also stated that after Chandler and Hoover spoke at Chandler's house, Hoover received some money. Furthermore, Rivera reported that Hoover had bragged that Chandler had paid him $200 to set the defendant up. Louis Moore, Rivera's live-in boyfriend and a good friend of the defendant's, also testified that he had overheard Hoover's bragging, as well. Charles Blalack, a customer and friend of the defendant's, testified that he was present at the shop when an employee handed the defendant $100. Blalack testified that after the defendant's employee handed the defendant this money, Hoover began to leave and Blalack heard the defendant ask Hoover if he would like a receipt.

At the close of proof, the jury convicted the defendant of his indicted charge, bribery of a public servant. As aforementioned, the trial court sentenced the defendant to serve three years in a community corrections alternative sentencing program. The defendant now appeals his conviction, challenging (1) the trial court's decision to admit certain exhibits over his objection; (2) a certain portion of the trial court's instruction to the jury regarding his indicted offense; and (3) the sufficiency of the evidence to support his conviction. For the following reasons, we find that the trial court acted properly and accordingly affirm the defendant's conviction.

## Propriety of Admission of Exhibits 2 and 5

The defendant argues that the trial court erroneously admitted Exhibits 2 and 5, both of which are tape recordings of incriminating statements made by the defendant, over his objection. Exhibit 2 is the tape recording of the conversation between Hoover and the defendant that took place when Hoover called the defendant to arrange to pay him. In that recording, the defendant responds that he does not "do business" over the telephone and that Hoover should meet him in person. Exhibit 5, which is substantially more incriminatory of the defendant, is the tape recording of the conversation that took place between Hoover and the defendant when Hoover met the defendant at his automobile repair shop in order to pay the defendant the agreed $100 sum. The defendant objects to the introduction of these exhibits because he had not reviewed these tapes prior to trial. The state counters that the defendant has waived this issue by failing to properly preserve the issue for appeal and that the court did not commit plain error by admitting the exhibits. Furthermore, the state argues that the prosecution made these tapes available to the defendant and that the defendant, who failed to take the appropriate steps to review and copy the tapes, cannot now complain that he was prejudiced by his own failure to act. We agree with the state for the reasons set forth below.

First, we will address the issue of whether the defendant has properly preserved this issue for appeal by taking "whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). At trial, the defendant did object to the introduction of Exhibits 2 and 5. However, he objected to their introduction on the grounds that he was improperly denied the tapes pursuant to discovery, as these tapes contained the defendant's statements and the state had the tapes in their possession and intended to use the tapes against the defendant at trial. The trial court overruled the defendant's request in light of the state's response to the defendant's discovery request, which stated that the state would make all discoverable materials available to the defendant during business hours. Additionally, the state's response included a handwritten

annotation by the prosecutor stating that she had attached the defendant's written statements to her discovery response and that "[t]ape will be supplied when we receive tape from the defendant," which we infer means that the state would supply the defendant with copies of the tapes in their possession once the defendant supplied the state with blank tapes for making the duplicates.

For the first time on appeal, the defendant now argues that the trial court should have barred admission of Exhibits 2 and 5 because the state failed to furnish the defendant with the tapes pursuant to its duty under Tennessee Rule of Criminal Procedure 16(a)(1)(C). Rule 16(a)(1)(C) provides that

> [u]pon request of the defendant, the State shall permit the defendant to inspect and copy or photograph . . . tangible objects . . . which are within the possession, custody or control of the State, and which are material to the preparation of the defendant's defense or are intended for use as evidence in chief at the trial, or were obtained from or belong to the defendant.

Tenn. R. Crim. P. 16(a)(1)(C). In his brief, the defendant concedes that while he objected to the admission of the contested exhibits at trial, he did not object to their admission as violative of Rule 16(a)(1)(C), nor did he include an objection to their admission under Rule 16(a)(1)(C) in his motion for new trial. However, an appellant cannot object to the introduction of certain evidence on one set of grounds at trial and then change grounds for objecting to the introduction of that same evidence on appeal. Such action constitutes waiver of the issue. State v. Brewer, 932 S.W.2d 1, 9 (Tenn. Crim. App. 1996); State v. Aucoin, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988). Furthermore, the defendant also failed to request a continuance after purportedly learning of the existence of these tapes for the first time at trial. Therefore, he has waived this issue on this basis, as well, because he failed to take the steps necessary to prevent or nullify the harmful effect of the alleged error. See Tenn. R. Crim. App. 36(a). The failure to object at trial to the introduction of the tapes on the basis that their introduction would violate Rule 16(a)(1)(C), combined with the defendant's failure to include this issue in his motion for new trial and his failure to move for a continuance when the state sought to introduce the tapes, dictates that this Court may only reach this issue if we determine that the trial court committed plain error by failing to exclude the tapes. See Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 52(b).

In order to review an issue under the plain error doctrine, five factors must be present: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. See State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000); State v. Adkisson, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994); Tenn. R. Crim. P. 52(b).

We find that the trial court's admission of Exhibits 2 and 5 was not plain error because the state did not preclude the defendant from reviewing or copying these tapes prior to trial. First, we can assume that the defendant was aware of the existence of at least Exhibit 5, the tape recording of the conversation between Hoover and the defendant that took place in the defendant's shop. Immediately after Hoover and the defendant ended their conversation, police officers arrested the defendant, advising him that they had heard and recorded the defendant's conversation with Hoover

in which the defendant accepted a bribe. Because the recording of the defendant's conversation immediately preceded his arrest and he was advised of the tape's existence during his arrest, we can impute knowledge of the existence of this tape on the defendant. Moreover, in its response to the defendant's discovery motion, the state indicated that these tapes were available for review and that the state would provide a copy of the recordings to the defendant as soon as he provided the state with a blank tape on which to make the recording. Therefore, because the defendant was aware of the existence of at least one tape and because the tapes were made available for the defendant's review, we cannot say that any substantial right of the defendant was affected by the trial court's admission of these exhibits into evidence. Thus, this issue lacks merit.

## Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence introduced at trial to support his conviction for bribery of a public servant. When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" state's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the state "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

As noted earlier, Tennessee Code Annotated section 39-16-102(a), which defines the offense of bribery of a public servant, states, in relevant part:

(a) A person commits [the] offense [of bribery of a public servant] who:
. . .
(2) While a public servant, solicits, accepts or agrees to accept any pecuniary benefit upon an agreement or understanding that the public servant's vote, opinion, judgment, exercise of discretion or other action as a public servant will thereby be influenced.

Tenn. Code Ann. § 39-16-102(a)(2).

The defendant's challenge to the sufficiency of the evidence to support his conviction centers around his attack on the credibility of the state's key witness, Michael Hoover. The defendant argues that Hoover is a patently unreliable witness, citing various examples of his unreliability from the record: his ingestion of marijuana during the time frame in question, Investigator Chandler's characterization of Hoover as irresponsible, Hoover's lack of an employment record, and Hoover's conviction for robbery. The defendant then juxtaposes Hoover's credibility against his own, citing his lack of a criminal record, his age, and his status as a self-employed business man, arguing that his version of the incidents surrounding his arrest are considerably more reliable. However, as we stated above, a verdict of guilty removes the defendant's presumption of innocense and replaces it with one of guilt. <u>Tuggle</u>, 639 S.W.2d at 914. Furthermore, a guilty verdict accredits the testimony of the state's witnesses. <u>Cazes</u>, 875 S.W.2d at 259; <u>Harris</u>, 839 S.W.2d at 75. The jury who convicted the defendant heard Hoover's and other witnesses' testimony. Through those testimonies, the jury learned of Hoover's drug consumption on the evening in question, his work history, his criminal record, and Investigator Chandler's opinion of Hoover. The jury's decision to convict the defendant indicated that they chose to accredit Hoover's testimony and discredit the defendant's testimony. It is not the role of an appellate court to second-guess such credibility determinations.

Furthermore, we find that the evidence introduced at trial is sufficient to support the defendant's conviction for bribery of a public servant. Viewed in the light most favorable to the state, the evidence demonstrates that after arresting Hoover, the defendant solicited a bribe of $200 from Hoover in exchange for the defendant's agreement not to report Hoover's arrest. Hoover subsequently met with the defendant in order to pay him this agreed sum of money, and the police monitored the conversation via a wire transmitter. During this conversation, the defendant accepted Hoover's money and responded that he would destroy the drugs that he had confiscated from Hoover and that he would "forget" about Hoover's arrest. After the defendant was subsequently arrested, he made an incriminating statement to the police in which he admitted that he agreed to accept a bribe at Roy Grant's proposal. Accordingly, we find that the evidence was sufficient for a rational trier of fact to determine that the defendant agreed to accept a pecuniary benefit in exchange for his agreement to influence his duty as a public servant. This issue lacks merit.

## Erroneous Jury Instruction

The defendant complains that the trial court committed error by instructing the jury that they could find the defendant guilty of the offense of bribery of a public servant if they found that the defendant acted intentionally, knowingly, or recklessly. The defendant alleges that this instruction was erroneous because the defendant's indictment reads that the defendant acted knowingly, and therefore the jury was allowed to find the defendant guilty of the instant crime if they found that the defendant acted intentionally or knowingly, but not recklessly. The defendant admits he failed to present this issue in his motion for a new trial and that the error is technically waived. <u>See</u> Tenn. R. App. P. 3(e). Nevertheless, he asks us to review this issue under the plain error doctrine. In response, the state avers that even if the trial court's instruction was erroneous, the trial court did not commit plain error because the error did not affect a substantial right of the defendant. Specifically,

the state argues that the facts of the defendant's case do not support a finding that he acted recklessly and therefore the defendant was not prejudiced by the trial court's instruction.

As noted earlier, the plain error doctrine requires us to examine and find the presence of five factors in the record before we may review an issue as plain error. See State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000). Those factors were set out earlier in this opinion and will not be re-listed here. We do, however, find that two of the necessary factors are not present with respect to this issue.

First we find that no "clear and unequivocal rule of law was breached." See id. The indictment charging the defendant with bribery of a public servant does indeed allege he acted "knowingly." However, the crime of bribery does not "plainly dispense with a [required culpable] mental state," Tenn. Code Ann. § 39-11-301(c), and therefore a cogent argument could be made that "recklessness" would suffice to support a conviction for bribery of a public servant. . Moreover, where a criminal statute does not "plainly dispense with a [required culpable] mental state," ordinarily it is the statutory language that determines the state's burden of proof with respect to the necessary mens rea for the offense, not the language in the indictment. See, e.g., State v. Haskel D. Finch, No. M2001-00340-CCA-R3-CD, 2002 WL 1204931, at *3-*4 (Tenn. Crim. App. at Nashville, June 5, 2001). However, with respect to the definition of bribery of a public servant, the offense requires that the public servant "solicits, accepts, or agrees to accept any pecuniary benefit upon an agreement or understanding . . ." that the public servant's official actions will be influenced by the pecuniary benefit. See Tenn. Code Ann. § 39-16-102(a)(2). An equally cogent argument could also be made that activities such as soliciting, accepting or agreeing cannot be done recklessly since they inherently require intent or at least knowledge. Without deciding which of these arguments is more meritorious it does not appear that a "clear and unequivocal rule of law was breached."

Secondly, the proof is simply overwhelming that the defendant acted both intentionally and knowingly in this matter. We are certain the jury would have had no need to resort to a finding that he acted recklessly in order to convict. Thus, we are confident that no "substantial right of the defendant" was adversely affected by the jury instruction as given.

For the reasons stated above we find that this issue is not appropriate for plain error review and is therefore waived.

### Conclusion

For the foregoing reasons, we find that none of the defendant's allegations merit relief. Accordingly, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE